So we're having one side each arguing, correct? Yes, Your Honor. Since we have other bodies here, I'm always... My colleague Brian Bricker is here, helped on the briefs, and our client James Mattis from World Champ Tech is here. All right, thank you. Thank you. Your Honor, if it pleases the Court, my name is Greg Gilchrist. I represent World Champ Tech. We agree with the District Court that the commercial strength of the mark is one of the three important factors that she looked at. She held that two of the factors favored World Champ Tech, similarity of the marks and relatedness of the goods and the likelihood of confusion analysis. But she found that the strength factor was so in Peloton's favor that that outweighed the other factors. We think that she made a significant error in the way that she considered commercial strength. There's been some effort, I think, on Peloton's part, and there was in the District Court, to sort of run away from what happened in the development of this mark. This was not an idle choice or model number where they were choosing to call their new product something that wasn't going to be used in their advertising and promotion of the product. They spent, and there's a protective order, they spent a very large, money that we would all think would be big, just to choose the name, and then they spent enough money to run a small city for a long time to advertise the name. They hammered the market with this new brand, every nook and cranny of the market, everywhere where World Champ Tech would be looking for customers or trying to find customers. And then the District Court essentially said, we're not going to consider the hammer, and that's one of the things that we think is a serious error in the Court's opinion. There are always... Well, if the consumer sees WCT's app in the Apple App Store, they will also see World Champ Tech listed as the producer of the app immediately next to the app icon and title. And wouldn't a reasonably prudent consumer see that information and understand that the app is produced by WCT and not by Peloton? They may see that the app developer is World Champ Tech. There's some small space devoted for some, I think it's 5,000 characters of text that you can look at at the App Store. But this is an industry where, to some degree, Peloton takes credit for developing, where you immediately think of software when you think of a Peloton bike. And in a lot of different areas, and Peloton has an app in the App Store, in a lot of different areas people are sponsored or authorized or licensed to create software that works with different products. So, yes, somebody might see the World Champ Tech name, and, of course, they did see that in the confusion survey that was conducted, and they still came to the conclusion that Peloton had been the one to put it out. Well, your expert on confusion was 12%, right? The survey showed a net confusion score of 12%. 29% of the people were confused in the test cell, and 17% were confused in the control cell. Well, I also saw Mr. Mathis's declaration that states that WCT's app was downloaded more than 500 times in 2021 and more than 300 times in 2022, and yet there's no indication that anyone was confused there. Doesn't that show there was no confusion? Your Honor, I think that we could fill up most of our page limit with cases that say that the absence of actual consumer-reported confusion is not the death knell to a trademark case at summary judgment. And when a party is small, like World Champ Tech is, the likelihood that you're going to get a report of likely confusion is accordingly also smaller. And the evidence that was put forward on the absence of actual confusion consists of our inability to show any actual confusion that was reported to World Champ Tech, and Peloton's witnesses' testimony from the R&D guy at Peloton essentially said, I don't know of any. But the record also shows, Your Honor, that we asked them to search their records for Bike Plus app, and they refused to do that. We made a motion. They refused to do that. I've always been taught that if you're going to make an argument about a significant point at trial, you need to provide discovery on it. They refused to search for Bike Plus app, but they are here saying that it's important for the court to consider that there's an absence of actual confusion. At trial, the jury could consider how much weight, which the courts routinely say is not significant. You know what? Why would isn't the burden is to show that your consumers, WCT consumers, are confused, not that Peloton's consumers are confused? So by you saying, well, Peloton should have produced evidence that its consumers were confused, is not the right question, right? Well, it's not necessarily our concern. Shouldn't we be looking at whether your WCT consumers are confused? Reports to Peloton, had they looked for them, could have come from consumers of both parties' products, or they could have come from consumers of our product that thought that it was going to work or be able to interface with the Bike Plus bike. Bottom line, the only evidence of any actual confusion that you have is your 12% survey, correct? The only evidence that we can produce. That's correct. And we're required, though, if it's as low as 10% to 20% to look for any other supporting evidence of confusion, and that's absent here, correct? No, I don't think that is correct, Your Honor. Other than the fact that Peloton didn't produce documents, what is the other supporting evidence you have for confusion other than that 12% survey? The Fortune Dynamic case involved a survey that reported 11% confusion, Your Honor, and the court said, and I believe, if I'm not mistaken— I'm not contesting that you say there's a 12% net confusion rate. What I'm saying is what is the other supporting evidence to support the 12%? Do you have anything else other than Peloton didn't produce documents? Do we have any evidence that shows why it was 12% other than the survey? No. Do you have any other evidence that there may have been confusion about the marks other than the survey? I'm sorry, actual confusion was reported by customers? Yes. No, we don't. We don't have any. Our client does not spend a lot of time interfacing with its customers, and as I say, the evidence that there was not any actual confusion evidence on Peloton's side is at least suspect. But we don't have any evidence there that a consumer reported being confused. And isn't that required to find likelihood of confusion? Is some evidence in addition to a 10% to 20% survey net confusion ratio? No. I think, Your Honor, if you look at the Fortune Dynamic case, it says exactly the opposite, that 11% survey in that case was sufficient and not only could be considered, but was required to be considered by the court as evidence of actual confusion. So that's the second place where we think the court made an error. She says in her opinion that the parties essentially attack the weight to be given the survey, but then she never considers it again after that and finds that the actual confusion factor favors Peloton. But I think if you look at the Fortune Dynamic case, it says the opposite. It doesn't say that you can consider it. It says you must. And even talks about the- No, okay. We're not in sync here. Okay. I'm sorry. I'm saying for evidence of likelihood of confusion, there has to be more than the survey. I'm not saying whether you can consider the survey or not. They didn't file a Daubert motion, right? They did not. So, you know, their arguments may go to weight, not admissibility. I don't know. But I'm just saying in order for us to say there is a likelihood of confusion, doesn't there have to be more than just the survey?  Fortune Dynamics talks about admissibility of the survey, and I am not at all, at all. They didn't file a Daubert motion. I'm not at all saying that that survey of 12 percent shouldn't have been admitted. I'm just saying there has to be more to say there's a likelihood, to make a finding of a likelihood of confusion than just that survey. There are seeds in the case that say that that's enough all by itself. But there is a lot more. And I think it does go to the other factors that the court did consider in our favor. But you just said there wasn't more. So I'm confused. Okay, I'm confused. There is a likelihood of my confusion now. I think Judge Koh and I were on a different page. I was trying to answer a question about whether there was evidence of actual reported confusion. So what is there more than the 12 percent? And I'm going to say, I'm going to agree with Judge Koh that we're going to consider the 12 percent. Okay, we're going to consider that document. But what more is there? Well, the more is all the other factors of confusion that there are, including the similarity findings that Judge Beeler made in World Champ Tech's favor, the fact that these are complementary goods that are thought about by consumers as likely coming from the same source. It's something that Peloton taught the marketplace when it developed this integrated fitness, that you think about the bike and you think about the software as coming from a single source. So those are factors that are important to likely confusion. The other factor that I think that the district court got wrong is the vast strength of the mark. We always talk about strength from two components, the conceptual strength of the mark and the commercial strength of the mark. And why? Because the more people that get reached, the more advertising that it does to reinforce the association between a brand and a single source, the more likely it is that somebody is going to associate that brand with a single source. Can I ask you about your letter to the Patent and Trademark Office? You, at that point, said, look, you know, this mark won't be confused with an actual bike. And you went through very specifically how this isn't an impulse action. You have to search the app store. You have to select it. You have to put in a passcode or a thumbprint. You have to scan the print. And then to determine whether you're going to do the WCT software, you have to consider the apps for the other competitors. And then, you know, depending on the data storage space on your device, you might have to delete some other apps. It was a very intentional, deliberate, premeditated process. And at that point, you're arguing, look, it's not likely going to be confused. So why wouldn't, you know, we look at that and take all those considerations. At that point, you were saying, hey, an end user is going to consider the apps of other competitors, but they're going to make a thoughtful choice. So give us this trademark. Why can't we now consider that? I think that it's an argument that could be made to a jury about why, in 2014, our client said that with a physical bike that had no software whatsoever, with a stylized mark, that its lawyer made arguments at that time that said that there was a distinction between the app that was being offered by World Champ Tech and the physical, non-connected bike that was being sold. No, let me just quote it. In determining that WCT software is that for which they are looking, the end user must consider the apps of other competitors, including, quote, Strava, end quote, an app which offers some but not all of the functionality of WCT's offering. I mean, that end quote, that wasn't saying, oh, someone's going to have a physical bike, and that's going to be the distinction. That's saying, nope, there are a bunch of apps here that do similar functionality, but a consumer is going to be careful about choosing ours. The trademark at issue, the application at issue, had to do with a physical bike versus an app. Yes, there was a discussion about choosing the app, and it's true now. There are a lot of apps, including Strava. Strava is identified as an app that's a competitor of Peloton's, by Peloton. It's in the record as a competitor of Peloton. They don't mention our app, but our app is competitive with Strava. So, yes, at that time in 2014, where people were looking at apps that were made by third parties and comparing them with a physical. But if Strava and Peloton are competitors, and you're saying, oh, but our consumers will not be confused with Strava's app. But now you're saying, but they will be confused with Peloton's app, who is a competitor of Strava. And, Your Honor, they were in the survey. The survey test stimulus showed the Strava app and the Peloton app as choices that could be made. They still, in that context, said that the Bike Plus app was put out by Peloton. So, yes, there are apps. But over the intervening years, Peloton has taught the marketplace that bikes and software come out from the same person. They're not just apps made by somebody that might be used when you're riding somebody else's bike. They're the ones that created the association in the consumer's minds between bikes and apps. And they have their own app in the app store. It was there to look at in the survey. But the PTO said, at that time, in 2014, that apps and bikes were confusing. That's why the lawyer was writing. The PTO said, and never backed away from that, we didn't get told that we could go ahead and use Bike More. It wasn't for the Bike Plus application. We didn't get told that we could use it until the Bike More application went away. So the PTO record will show that the PTO, in 2014, before Peloton became as big as it did and integrated fitness became as big as it did, concluded that apps and bikes were likely to be confused if the same names were used. So when Peloton's lawyers got together when they learned about the Bike Plus trademark and investigated our client, they could easily have looked, and probably did, to see what the PTO thought about confusion between bikes and apps. And if they looked at the office action response, they would have determined that the PTO thought those two things were confusing. So yes, our client's prior counsel argued against that finding, did not win, but made some comments about the process that's, at that time, involved in downloading an app. Of course, we've all gotten a lot more familiar with downloading apps. All right, so we're over time, but I'm going to make sure my colleagues don't have additional questions. No, thank you. All right. So we've taken you a minute over, but I'll give you two minutes for rebuttal, since we asked you a lot of questions. I appreciate it, Your Honor. Thank you. Good morning. Good morning, Your Honor. Jeffrey Davidson, Covington & Berlin, on behalf of Peloton. The District Court correctly entered summary judgment. Cases are not supposed to go to trial pulling jurors out of their daily lives when there is only one reasonable outcome. Here, no reasonable jury could find that an appreciable number of consumers were likely to believe that WCT's Bike Plus app originated with Peloton. Well, the 12% confusion survey, I think that I know that you say the court shouldn't have considered it, but I'm going to consider it, and I think you got indications someone else is. So it's above the 10% that I think that your position would be stronger if it were 10% or 7% or anything like that. And the Ninth Circuit case law seems to be a bit confusing that some people think that everything should go to a jury trial. So tell us about the 12%, since it is over the 10, why that isn't enough. Let me try to address that in two pieces. So the survey is relevant to this factor of actual confusion. The overall standard is, is there a likelihood of consumer confusion? One relevant factor to consider is, well, in the real world, have we actually seen that confusion emerge? So at some level, all of us have been conducting the ultimate survey because these products have coexisted in the marketplace for, at this point, more than four years, and there's not a scintilla of evidence that any actual human being has ever been confused to think that WCT's app originated with Peloton. The survey is, at most, a proxy or second-best evidence for actual confusion. Well, I asked that, and, Mr., you don't emphasize this as much as, and there might be a reason for this, but the fact that Mr. Mathis's declaration states that WCT app was downloaded more than 500 times in 2021 and more than 300 times in 2022, how does that, what's your interpretation of how that relates to confusion? So, I mean, I think that's a pretty good sample size. I mean, there are people out there who are, you know, seeing, you know, page views of WCT's app. There are a few people downloading it. They are not confused. There is no evidence of that. And Mr. Mathis himself wrote, and this is at SCR 170, that he was hoping to find evidence of confusion. He was on a quest to look for it. So if his customers were confused, we would know about it. And that's just ground truth. We live in a land of reality. And the reality here is that no one has been confused or is likely to be confused by the party's coexistence. And I just really want to focus on that for a second. This case presents really a unique situation where WCT, it's a one-person company. It's essentially defunct. At the time Peloton's bike was launched, it was not doing any marketing. Its monthly revenue was $36. Let me ask you something. If you think the survey was so flawed that it shouldn't be considered, why didn't you file a Daubert motion? The view was that it wasn't saying anything relevant. And the reason is that in order to know whether the Bike Plus is what's being associated with Peloton, the comparator needs to exclude the possibility that Peloton was the problem. But you thought it wasn't relevant so it should be considered. But now you're arguing, no, it shouldn't be considered. Isn't that inconsistent? No, it was not relevant. And, therefore, it adds no weight even on the actual confusion factor. And, you know, let's recall, the actual confusion factor, you know, focuses first and foremost on the real-world experience. But I would also say everything gets combined into an overall analysis, as the district court correctly found. And, really, the fact that WCT had no customer base, material customer base that could be confused is a unique fact in this case. That means that no reasonable jury could find an appreciable number of concerns. Well, any time you have things like eight-factor tests and all of that, it's easy enough to find tribal issues within that. So what do we do about that? This court has repeatedly affirmed district courts' ruling that there was no likelihood of confusion on summary judgment. The Lerner and Rowe case from last year is a good example of that happening. I would point to the M2 communications case, the Align v. Lululemon case that has a lot of factual similarity to the case here. So it just depends on the fact pattern that is presented to this court. And here, just in the land of reality, there are not consumers of WCT's product who are likely to be confused into thinking it originates with Peloton. You say you're arguing on the one side. Well, we're going to win anyway. So, you know, why don't you summary judgment to RIP? Rest in peace. You know, put this baby down because we're going to win in the end because they've either abandoned their mark or that they misrepresented things to the PTO or any number of things, which would all be defenses that you could raise later. But I'm sort of just moving us back to the summary judgment. And there are cases, you know, when you're looking at summary judgments, there are cases that you look at and you say, oh, this is a loser. But that doesn't mean that there's not a tribal issue. So that's where I'm struggling. Yes, and the district court correctly recognized that no reasonable jury looking at this fact pattern could conclude that there's a likelihood of confusion. And I think one factor I'd like to sort of bring to the foreground here is let's remember what mark we're talking about. It's the bike plus mark. WCT's principal admitted at his deposition, and this is found at SCR 33, that that is intended to evoke a better biking experience. So it's bike plus. It's a bike, and it is improved in some way. That is exactly the way that Peloton, when it was making its branding decision, chose to go about it. Let me ask you, when Peloton made its branding decision, they were aware of WCT's mark, even got outside counsel's opinion. Isn't that intent? Shouldn't that be evidence of intent, that they went ahead anyway, knowing that they would be potentially infringing? Not remotely, Your Honor. So WCT's app is registered. They have a trademark registration. It's registered in the app slash software category. So there was no reason to think that Peloton, whether or not... Well, in-house counsel was concerned enough to get an outside counsel opinion, right? You wouldn't do that if it was sort of as blasé as you're representing. Would you? You would pay for an outside counsel opinion to protect yourself from a claim of infringement in the future if you really thought it was completely different? I don't think... And we have not put the outside counsel's opinion at issue, so it's not that. It's just a routine trademark clearance of the type that large companies launching products do all the time. So, yes, they were aware that WCT had a registered mark in the app space, but that is quite different from a physical bike, a large, heavy, indoor, stationary fitness bike. And with respect to the district court, this is where we part company with her a little bit. She found that the products were similar enough. They really are not. Judge Koh, as you pointed out, Mr. Mattis himself advocated to the PTO, you know, that no one could confuse an app with a physical bicycle because they were in all manner different. And that is the case. Pelotons, indoor, stationary bikes are sold through channels that are suited towards selling large... But it does seem that the district court created some errors as to Factor 1 and Factor 3. Because on Factor 1, the court found that WCT's mark was descriptive, the court sort of bypassed the analysis that was supposed to be done about the relative comparisons of the marks. Would you agree? Nothing in Ironhawk says that if you find it descriptive, you get to bypass, you know, weighing whether the conceptual strength of WCT's mark, how that compares, and it is overwhelmed by the commercial strength of Peloton's mark, right? I would not agree, Your Honor. The mark is descriptive. It's bike plus. It doesn't describe everything about the product, but it describes it. But even if it is, I'm not asking a question about that. There's nothing in Ironhawk that says if you find it descriptive versus suggestive or anything else that you can bypass that first factor in sleek craft. Ironhawk, in many of the other cases, kind of assumed that the senior user has some commercial strength to protect. Otherwise, you know, why would they be in court? You know, the district court recognizes that this is an unusual fact pattern where there is essentially nothing to protect. The brand is valueless. There are essentially no consumers. So if the question is, is there – But then wouldn't that then weigh in favor of WCT? Not with a descriptive mark. And that would really be a reverse. But I still – tell me where in Ironhawk it says that you don't have to do the comparison if it's a descriptive senior mark. Because I don't see that, and that's kind of what the district court did. It said, well, this is descriptive, so okay. I'm making this conclusion on this factor one. Ironhawk – it was counsel in Ironhawk. You know, it was just a different fact pattern where the senior user did have a base of customers and revenues to protect. So it's not an issue that this court reached. But the district court correctly recognized that we're here for a reason, right? We're here to protect brands, and we're here to protect consumers from confusion. And in a situation like this one, where there is really nobody to be confused, it follows directly that there is no likelihood of confusion. These factors are supposed to be used flexibly in order to answer kind of the fundamental question, which is, is there enough here to take the jury out of their daily lives and adjudicate the case? You know, here there's only one reasonable outcome. And so even if you weigh a factor two or a factor two in favor of the plaintiff, that doesn't get you to an overall conclusion. Can you respond to what your friend on the other side talked about on the commercial strength? The commercial strength of Peloton? Yeah. So Peloton, and one thing to recognize about how these marks appear in the marketplace, is that Peloton is not seeking to create brand equity with Bike Plus. It had a bike, it had a better bike, and it called it Bike Plus. It had a treadmill. The better one's called Tread Plus. What Peloton is trying to do is to create equity in the Peloton mark, the Peloton brand. And that means something very important for purposes of this case, which is when Peloton uses the word Bike Plus, it does it in proximity to Peloton with all of the characteristics of the Peloton brand, the capital letters, the font, the positioning it next to a descriptive name. So when a consumer sees that, they do associate, they see this as Peloton's Bike Plus. That does not mean that when they then see WCT's app on the app store with World Champ Tech right there, that they would associate that with Peloton. And I think that is especially the case because we're talking about, as WCT admitted, sophisticated customers that he called them serious outdoor biking enthusiasts is their customer base. They're looking to download something that's about their health, their fitness. So these are customers who are sophisticated, and they're also used to going through the app store process that has these repeated validation steps that need to be undertaken. Under those circumstances, the way that these two- Let me ask you about another error I think the district court committed, and that is on factor three. The court said, well, if there's a housemark, then a reasonable jury is going to say there's similarity. But the law says that a housemark could aggravate confusion or lessen confusion. It's not automatically a finding of similarity.  It depends on the circumstances of the case. And so for an example in Cone versus- I'm sorry. I want a clear answer. Are you agreeing that a housemark can aggravate or can lessen confusion for similarity in the mark or not? This court has said that it can, and in some cases, it can dispel confusion. It depends on the facts of the case. So in a case like- Right, but in this case, the court said, well, the existence of a housemark means reasonable jury will find these are similar. Right, and she's looking at an overall record that shows that these marks are being deployed in different commercial spaces. So one is in the physical large stationary bike space. The other is being deployed in the app cyberspace. One of them is being accompanied with this very notable set of branding conventions on the Palatine side. One of them's not. So under those circumstances, this case is much more like Cone versus Petsmart. That's the where pets are family case. And what this court said in that case is, look, when you're talking about a veterinary clinic and a pet store, one large, one small, under those circumstances, the fact that both of the market participants prominently featured the housemark, if anybody was about to be confused by who was the origin, the answer was right there looking at them. And the same is the case here. If you're looking at a Peloton bike plus, it says right there that it's from Peloton. If you're looking at WCT's app, it says right there that it's WCT. So in the real world, in the real world of whether we should be impaneling a jury to decide this case, there just really is no likelihood of confusion. And, in fact, we have been conducting the ultimate experiment, you know, for the past four years of whether a customer could likely be confused. And we have the answer. The answer is that no one has been confused. We've had four years of track record. But you haven't produced the document, so how do we know? I mean, that's a lawyer argument, right? Have you made the document production that could have actually, in fact, disclosed whether any customer was confused? What was the basis to withhold a discovery anyway? Well, I guess I would say a couple things. It's summary judgment, so it's time to come forward with your evidence. And any discovery disputes, you know, those are over. They're not appealing those. The truth of the matter is that there have been more than 10 depositions, hundreds of interrogatories and requests for admissions, tons of document requests. So if there were an opportunity for confusion to happen, we would know. And as you pointed out in my colleague's argument, the relevant question here is not about Peloton's customer base. Well, a deposition wouldn't reveal it if the discovery hasn't been collected and reviewed, right? Maybe people haven't looked. If the question were, are Peloton's customers confused, which it's not, that is certainly a question you can ask about at deposition. But the question is not that. The question is, are WCT's customers confused? Their client has been on the quest, hoping for evidence of actual confusion. He would have access to that had it occurred, and it has not occurred. So what was the basis to withhold a discovery that you thought it was not relevant? You know, the discovery issue wasn't raised on appeal, so I haven't looked at that carefully. It may well have to do with what the request said. It may have to do with the fact that any confusion by Peloton's customers would not be relevant to the question, which focuses on WCT's customers. At bottom, I would say that the district court correctly reached an overall weigh-in of the factors that confirmed that there was no likelihood of actual confusion and properly entered summary judgment. Thank you. Thank you. Thank you, Your Honor. You have two minutes. Thank you, Your Honor. Just in response to one of the last things that was said, Judge Koh, I would point you to the Real v. Amazon case. It's at 34F4 on page 131. And at that place, the 11th Circuit collects decisions from the 1st, 2nd, 3rd, 7th, 9th, and 11th Circuits, all of which say that in a reverse confusion case, the use of a housemark can aggravate the likelihood of confusion. Another point that I wanted to go back to was the ---- But what if their response was, Well, but the judge made an assessment and decided in this particular case. Well, the judge did make an assessment in this case and said that, yes, it could aggravate confusion, because coupled with the large advertising expenditure, the Bike Plus brand became exclusively associated with Peloton, and that's exactly the harm that gets created when somebody like ---- But you would say there was no error on that part. I ---- There was no error on that part. The court didn't assume that the existence of a housemark was automatically aggravating, that they made a factual decision based on the record here and did the required analysis. We agree with the district court's decision on the similarity of the mark. She said that that was in our favor, and she referred to the 9th Circuit decision on that point. I did also want to go back to this issue of the district court bypassing the commercial strength issue of Peloton's mark, because we do think it's important to that factor. The 9th Circuit decisions are just absolutely clear. The Ironhawk case says it, as you mentioned, and the Ironhawk case goes a little further. The only customer they had at that point was the Navy, and the decision of the court was that, yeah, but we have to consider the prospective customers, not just the customer that they have today. The Lodestar case is even more explicit on this point, because the Lodestar case involved somebody who was producing ---- Let's say you win on strength of the mark, but then why should you win overall? Well, if we win on strength of the mark and ---- But you lose on many other things, right? I think that if we win on the strength of the ---- You lose on similarity of the mark, evidence of actual confusion, degree of consumer care, marketing channels, likelihood of expansions neutral, then why should you win, even if you win on strength of the mark? Because I think the district judge correctly determined that the goods were similar. She correctly determined that the marks were similar. If she concluded properly that the marks were strong, at least in the hands of Peloton, and weighed that, she would have concluded that factor favored World Champ Tech. Those are the three important factors that she identified. The actual confusion evidence should have been considered by the court. The 12 percent is enough to show that that factor weighs in our favor. If it's not dispositive of the case, it's very important. The courts are very clear that the absence of actual reported consumer confusion makes that factor not that important. But if there is evidence of actual confusion, that factor is considered as very important. So that would be the four important factors that would weigh in our favor. We've disagreed. We've briefed the issues about the channels. They were everywhere with the advertising of this brand. We disagree. And there are cases, and we cite them, about whether the sophistication here, where you're talking about complementary products, does this go with that? If I'm choosing my vitamins, maybe I'm careful about whether I'm choosing between A and B. Okay, you're over over, so double over. But let me make sure my colleagues don't have any additional questions. No, thank you. All right, so no additional questions. Thank you both for your argument on this matter. This will stand submitted. This court is in recess until tomorrow at 9 a.m. And the students, if you remain, our law clerks will talk to you, and then after we conference, we'll return. Thank you. Thank you very much, Your Honor. All rise. This court is in session, and adjourned.
judges: CALLAHAN, BADE, KOH